IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GREGORY D. SMITH,

                          Plaintiff,

   v.                                                 1:06-cv-1441-WSD

CONTINENTAL CASUALTY
COMPANY and THE HARTFORD
LIFE AND ACCIDENT
INSURANCE COMPANY d/b/a
THE HARTFORD GROUP
BENEFITS

                          Defendants.

## OPINION AND ORDER

This matter is before the Court on Plaintiff Gregory D. Smith's Motion for

Summary Judgment [21] and Defendants Continental Casualty Company

("Continental") and The Hartford Life and Accident Insurance Company's

("Hartford,") (collectively, "Defendants") Motion for Summary Judgment. [22].

## I.    INTRODUCTION

This case raises three interesting questions of interpretation regarding an

ERISA benefits plan.  The case involves Gregory D. Smith, ("Smith") an employee

covered under the plan at issue who suffered from degenerative disc disease and a

job-related back injury during the term of the plan's coverage.  Neither of these conditions separately or in combination rendered him totally disabled.  Two years after suffering the on-the-job injury, Smith elected disc fusion surgery to relieve the back pain apparently caused by the combination of his degenerative disc disease and injury.  During this procedure, the surgeon misplaced a screw in Smith's spine, which damaged his nerve root at the L5 vertebrae.  As a result, Smith experienced weakness, numbness, and pain in his left leg.  A second corrective surgery removed the misplaced screw, but Smith still suffered a significant loss of sensation and control in his left foot and began experiencing constant new left leg and back pain.  A third surgery replaced the disc fusion hardware, which relieved much of Smith's back pain, but his leg and foot numbness did not improve.  As a result, Smith now claims that he is unable to perform even sedentary work full-time, and thus qualifies as permanently disabled under the plan.

The plan covers  "bodily injury caused by an accident which occurs while the Insured Person is covered under [the] policy, and that results, directly and independently of all other causes, in a loss covered by [the] policy." (Policy, GP-12.).  Benefits are receivable only if the insured sustains a permanent disability

"beginning within 180 days" of a covered accident.  The plan also has a limitations period for suit, the running of which is ultimately measured from the "date of loss."

The three central issues in this case are: (i) whether Smith's current disability was caused "directly and independently of all other causes" by the screw misplacement; (ii) whether the screw misplacement, which occurred during a surgical procedure, constitutes an "accident" under the policy; and (iii) how the Court should determine the date of "loss" for purposes of the Policy's limitations periods.

To address these questions and the subsidiary issues that arise from them, the Court carefully applies existing Eleventh Circuit precedent to the issues raised. The Court concludes that the surgical screw misplacement constitutes an "accident" under the terms of the policy at issue in this case.  The record in this case is insufficient to determine whether the screw misplacement was the direct and independent cause of Smith's injury, or to determine whether Smith is disabled under the terms of the policy.  The Court therefore remands these issues for further consideration by the parties.  The Court also concludes that the date of "loss" should be measured from the earliest date the insured reasonably should have known that he suffered from a permanent disability.  The record is insufficient for

-3-

the Court to determine the date of loss, so Defendants' summary judgment motion on this ground must be denied.

## II.    FACTUAL BACKGROUND

Smith seeks long-term disability benefits under a group accident policy offered by his former employer, Georgia Power Company (the "Policy"). Continental issued the Policy, and Hartford administered it.  The parties agree that the Policy is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq.  The parties also agree that Hartford has a financial stake in Continental, and thus had a financial conflict of interest at the time it administered Smith's claim.  If the Policy grants discretion to the administrator, the "heightened arbitrary and capricious" standard of review applies.

### A.    Smith's Injuries

Smith worked as a cable-splicer for Georgia Power Company ("Georgia Power") from 1980 to 1999.  Smith's work required heavy physical labor.  In 1995, Smith began experiencing lower back pain, and he was diagnosed with degenerative central disc herniation at the L5-S1 level.  The herniation caused Smith significant back pain, but did not impinge his nerves or cause any paralysis.

-4-

It is undisputed that Smith's condition was not permanently disabling.  Smith continued working for Georgia Power as a cable-splicer.[1]

In 1997, Smith was working in a manhole when the ladder on which he stood rolled away, forcing him to suspend himself in the opening to avoid falling 25 feet to the manhole's bottom.  Smith may have struck his back against the edge of the manhole when the ladder fell away.  During the struggle to avoid falling, Smith injured his back (the "1997 injury").  Dr. Velazco treated the 1997 injury with epidural injections and physical therapy.  While these treatments failed to alleviate Smith's back pain completely, he was able to work, although he sometimes required modified duty assignments.

In light of Smith's continuing pain, Dr. Velazco recommended in September of 1999 that he undergo an L5-S1 discectomy and spinal fusion procedure.  Dr. Velazco believed that surgery might improve Smith's level of comfort and allow him to spend less time on light duty.  Smith sought second opinions from two other physicians, both of whom disagreed with Dr. Velazco's recommendation.  Smith elected to undergo the procedure.

---

[1] Although Smith was generally capable of heavy labor, he occasionally requested and received lighter duty assignments when his back pain became aggravated.

On October 12, 1999, Dr. Velazco performed a fusion procedure on the vertebrae from the L5 to S1 levels (the "October surgery").  The fusion procedure affixed rods and other hardware to Smith's vertebrae, in part by screwing them directly into the vertebral bone.  Some of the screws were inserted directly into Smith's pedicle, part of his vertebral skeletal structure.  During the procedure, Dr. Velazco inadvertently misplaced one of these screws, inserting it into Smith's nerve root canal and injuring his L5 nerve root.

After the surgery, Smith experienced new symptoms including numbness, pain, and loss of sensation in his left leg and foot, and additional back pain.  Dr. Velazco discovered the misplaced screw and performed another procedure several days later to remove it and retighten the remaining hardware.

Smith's symptoms became worse after this second surgery.  He suffered further loss of sensation and control in his left foot.  Much of the pain in his left leg persisted.  These symptoms often reduced Smith to using a cane or a wheelchair.

In June of 2003, Smith underwent two further surgeries.  Those surgeries sought to remove and replace the hardware implanted during the 1999 procedure.  Soon after the surgery, Dr. Empting, Smith's neurologist, noted that Smith's back pain had improved, but the symptoms from damage to his L5 nerve root had not.

Dr. Empting opined that the damage to the L5 nerve root was likely caused by the 1999 pedicle screw misplacement.

On April 3, 2004, Dr. Empting opined that Smith was approaching maximum medical improvement.  Dr. Empting concluded that Smith was permanently disabled from all full-time work, even sedentary work.  Dr. Empting indicated that the L5 nerve root damage was a substantial cause of Smith's disability.  Dr. Empting did not comment on how, if at all, Smith's degenerative disc disease and back injuries contributed to this disability, and there is no other statement in the record that discusses this point.  The record states that Smith has not been released to work since October of 1999.  Although the record is silent on the issue of whether Smith has worked since 1999, Defendants do not contend that he has.

B.    The Policy

At issue in this case is the Policy's "Permanent Total Disability Benefit" provision.  That provision states, in relevant part:

> If, because of a covered injury and beginning within 180 days after the date of the accident, the Insured sustains Permanent Total Disability as defined below, We will pay 100% of the Principal Sum . . . .

-7-

> "Permanent Total Disability" means disability which meets both of the following requirements:
>> A). has for a period of 12 consecutive months, continuously prevented the Insured from engaging in any occupation for which he or she is or becomes qualified by education training or experience; and
>> B). is determined be [sic] competent medical authority to be permanent, total and continuous.

(Policy, GP-22.)

The Policy defines "Injury" as "bodily injury caused by an accident which occurs while the Insured Person is covered under this policy and that results, directly and independently of all other causes, in a loss covered by this policy." (<u>Id.</u> at GP-12.)  The Policy excludes from coverage injuries "caused by or resulting from . . . [s]ickness or disease." (<u>Id.</u> at GP-13.)

The Policy provides in the "Time of Payment of Claim" section that "[b]enefits payable under this policy will be paid immediately after We receive due written proof of loss." (<u>Id.</u> at GP-14.)  The Policy requires that due written proof of loss:

> must be given to Us within 90 days after the date of such loss. If it is not reasonably possible to give the proof within 90 days, the claim is not affected if the proof is given as soon as possible. Unless the Insured Person is legally incapacitated, written proof must be given within 1 year of the time it is otherwise due.

-8-

(Id.)

The Policy also limits the insured's rights to sue.  The Policy states, "No action can be brought after 3 years . . . from the date written proof is required." (Id. at GP-15.)

C.    Smith's Claim History

Smith submitted several claims under the Policy during the time period at issue in this suit.  The parties dispute which claim is at issue.

On October 5, 2000, Smith submitted a claim on a handwritten form for injuries incurred when he suffered the 1997injury.  The claim stated that the date of the accident was "7/97," and that Smith's last day worked was "8/99."  Continental denied this claim by letter dated April 5, 2001, basing the denial on Smith's failure to sustain a permanent total disability beginning within 180 days of his injury as required by the Policy.

On September 16, 2003, and May 6, 2004, Smith's attorney communicated with Defendants without filing a formal claim.  On September 16, 2003, Smith's attorney submitted a letter inquiring if Smith was still covered by the Policy, and stating that Smith anticipated making a claim in the near future.  Eight months later, on May 6, 2004, Smith's attorney submitted another letter, claiming benefits

for Smith because he had become permanently and totally disabled as a result of an accident sustained during the surgical procedure in October of 1999.  The letter specifically noted the misplaced screw as the "accident" causing the disability.

On June 7, 2004, Smith, through his attorney, submitted a new claim form for disability benefits resulting from the 1999 surgery ("June 7 claim").  The new claim stated that Smith had last worked on October 9, 1999, that his injury occurred in the operating room, and that his doctor advised him in 2004 that his disability was permanent.

Hartford denied Smith's June 7 claim in a letter dated in September of 2004. Hartford advised Smith it had denied his claim because: (1) it did not consider the misplaced screw an "accident" within the Policy's terms; and (2) the screw misplacement was not a "direct and independent" cause of his disability.

Smith's attorney appealed this denial on September 17, 2004.  The appeal included a letter from Dr. Empting, who stated that Smith would have a "substantially more functional status" but for the screw misplacement, even with his other existing back injuries.  Dr. Empting did not address the degree to which Smith's preexisting conditions contributed to his disability, if at all.  Hartford denied the appeal in a letter dated December 14, 2004, because: (1) it did not

consider a misplaced pedicle screw an "accident" within the Policy's terms; (2) the pedicle screw misplacement was not a "direct and independent cause" of his disability; and (3) based on Hartford's review, Smith should have been able to perform sedentary work at least by the beginning of 2004, and thus was not permanently disabled.[2]  Hartford noted that Smith had exhausted his administrative remedies.

## III.   STANDARD OF REVIEW

###   A.   Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-

---

[2] Hartford sent Smith's file to be reviewed by Dr. Hyman Glick on December 6, 2004.  Dr. Glick concluded in part that Smith should have been able to perform sedentary work at least by the beginning of 2004, and thus was not permanently disabled.  Dr. Glick did not examine Smith and Smith was not given an opportunity to contest Dr. Glick's report.

movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."   Scott v. Harris, 127 S.Ct 1769, 1776 (2007)

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    ERISA Standard

When evaluating a plan administrator's decision to deny benefits under a plan governed by ERISA, the Court first must determine the applicable standard of review.  The Supreme Court has established three distinct standards: (1) *de novo*, where the plan does not grant the administrator discretion; (2) "arbitrary and capricious," where the plan grants the administrator discretion; and (3) "heightened arbitrary and capricious," where the plan grants the administrator discretion but the administrator operates under a conflict of interest.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134 (11th Cir. 2004).

The *de novo* review standard does not apply where a plan contains "express language 'unambiguous in its design' [giving] the Administrator discretionary authority to determine eligibility for benefits or to construe the terms of the Plan." Kirwan v. Marriott Corp., 10 F.3d 784, 789 (11th Cir. 1994).  Silence in a plan does not confer discretion.  Id.

The parties disagree over whether Hartford had "discretion" in administering Smith's claims.  Hartford argues that the Policy language requiring "due written proof of loss" is a grant of discretion.  Smith argues that the phrase "due proof" is

ambiguous, and that it could mean "timely proof or proof that complies with the plan requirements regardless of whether it is satisfactory to Continental."

The Eleventh Circuit has not directly considered whether the term "due proof," standing alone, confers discretion to a plan administrator.  A review of language in other ERISA plans indicates to this Court that a plan must contain language that confers discretion more directly and explicitly than the ambiguous term "due proof" before the arbitration and capricious or heightened arbitrary and capricious standards apply.

The Eleventh Circuit has held provisions requiring *satisfactory* proof of loss sufficient to confer discretion to the administrator, because the most reasonable interpretation of such a provision is that the proof must be satisfactory to the policy administrator.  In Curran v. Kemper Nat. Servs., Inc., 2005 WL 894840 at *3 (11th Cir. March 16, 2005), the court held that "[p]rovisions requiring satisfactory proof have been determined that the inclusion of language requiring 'due proof' constitutes a grant of discretion sufficient to apply the arbitrary and capricious standard of review" in a case where the policy provided that "[a]ll proof of disability submitted . . . must be acceptable to the Board of Review, the employer or their agents, who shall have sole discretion in determining the acceptability of

such proof.").  Similarly, in <u>Tippett v. Reliance Standard Life Ins. Co.</u>, 457 F.3d

1227 (11th Cir. 2006), the court found that a policy that required insured to

"submit satisfactory proof of Total Disability" conferred discretion to the policy

administrator.  Both <u>Curran</u> and <u>Tippett</u> involved policies whose language

expressly stated that "proof be satisfactory or acceptable to the administrator . . . ."

<u>Curran</u>, 2005 WL 894840 at *3.  <u>Yeager v. Reliance Standard Life Ins.</u>, 88 F.3d

376, 380-81 (6th Cir. 1996), on which <u>Curran</u> relies, also granted discretion

because the policy required that proof loss be satisfactory to the plan administrator.

The Policy at issue in this case does not contain language "unambiguous in

its design" requiring that the proof be acceptable or satisfactory to the

administrator.  The Policy provides only that the proof be "due."  In examining

definition of the term "due," particularly in the context of the phrase "due proof of

loss," the most applicable definitions seem to be: "Just, proper, regular, and

reasonable," Black's Law Dictionary 538 (8th ed.), or "adequate, sufficient."

Webster's Encyclopedic Unabridged Dictionary 603-04 (1996).  <u>See</u> <u>also</u> "regular,

lawful."  Merriam Webster's Online Dictionary (10th ed.); "proper; appropriate"

Compact Oxford English Dictionary.

The term's plain meaning is thus that the proof be just, proper, regular, reasonable, or sufficient.  The term "due" is not tied to and does not imply the exercise of any discretion by plan administrator discretion.  Indeed, its use is somewhat ambiguous in the Policy.  "Due" is susceptible to variation in its applicable meanings, but none of the definitions can be construed as an unambiguous grant of discretion to the administrator to decide if the proof is acceptable; rather, the proof is judged by more objective criteria largely independent of the administrator's discretion.  The term "due" simply does not grant a plan administrator unambiguous discretion to reject proof or claims.

Defendants rely on the fact that Curran grants arbitrary and capricious review under a policy that used the term "due proof."  That reliance is misplaced. Curran did not hold generally that the term "due proof" constitutes a grant of discretion; rather, Curran held that a policy granted discretion to the administrator when it expressly stated that proof had to be satisfactory to the administrator and that the policy's later use of the term "due proof" reinforced that grant of discretion.  Curran, 2005 WL 894840, at *3.  For any standard but de novo to apply, the Court requires such unambiguous language.  Because the Policy does

not contain an unambiguous grant of discretion, the *de novo* standard of review applies.

Under the *de novo* review standard, the Court merely asks whether the Defendants' benefits denial decision is "wrong," that is, whether it disagrees with the administrator's decision.  <u>Williams</u>, 373 F.3d at 1138.

## III.  DISCUSSION

The summary judgment motions filed by Smith and the Defendants present the same arguments on the same issues.  The Court will thus address the motions together.  In doing so, the Court makes all inferences from disputed fact in favor of the non-moving party.

A.      <u>"Accident" Under the Policy</u>

The most logical issue to address first is whether the screw misplacement Smith alleges in the June 7 claim constitutes an "accident" within the meaning of the Policy.  Defendants contend that pedicle screw misplacement is a known complication of the type of surgery performed on Smith, with a 30% chance of occurrence.  Defendants further argue that because the incident happened during a

surgery, it cannot be an "accident" within the terms of the Policy, and even if

surgical mishaps can be accidents generally, pedicle screw misplacement is a

known risk, the occurrence of which does not qualify as an "accident."[3]

The Policy covers "bodily injury caused by an accident . . . ." (Policy, GP-

12.)  The term "accident" is not defined.  Contract terms in ERISA policies that are

not specifically defined are interpreted according to their "plain and natural"

meanings.  Bedinghaus v. Modern Graphic Arts, 15 F.3d 1027, 1029-30 (11th Cir.

1994).  Plain and natural meanings are "meanings which comport with the

interpretations given by the average person."  Wickman v. Northwestern Nat'l Ins.

Co., 908 F.2d 1077, 1084 (1st Cir. 1990).

"An insurance contract is ambiguous if it is susceptible to two or more

reasonable interpretations that can be fairly made.  When one of these

interpretations results in coverage and another results in exclusion, ambiguity

exists in the insurance policy."  Dahl-Eimers v. Mut. of Omaha Life Ins. Co., 986

F.2d 1379, 1381 (11th Cir. 1993) (citations omitted).  See also Auto-Owners Ins.

Co. v. Parks 629 S.E.2d 118, 121 (Ga. Ct. App. 2006) ("If a provision of an

---

[3]  If some known possibility of occurrence disqualified an event from
constituting an "accident," males under the age of twenty-five would be unable to
recover from this Policy if they suffered a disabling injury in a car wreck.

insurance contract is susceptible of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous, and the statutory rules of contract construction will be applied.").  If ambiguity exists in an insurance contract's term, then the doctrine of *contra proferentem* dictates that the term be construed against the drafter.  Billings v. UNUM Life Ins. Co. of Am., 459 F.3d 1088, 1094 (11th Cir. 2006); Parks, 629 S.E.2d at 121; O.C.G.A. § 13-2-2(5).

There is no Eleventh Circuit authority construing the term "accident" in an ERISA policy, although other Circuits have addressed this issue.  In Senkier v. Hartford Life & Acc. Ins. Co., 948 F.2d 1050 (7th Cir. 1991), the Seventh Circuit held: "When you die from the standard complications of standard medical treatments you don't, it seems to us, die in or because of an accident; your death is the result of illness."  Id. at 1053-54.  Cf., Thomas v. AIG Life Ins. Co., 244 F.3d 368 (5th Cir. 2001) (describing Senkier as holding non-accidental the "foreseeable result of treatment. . . .").

On the other hand, in Whetsell v. Mut. Life Ins. Co. of N.Y., 669 F.2d 955 (4th Cir. 1982), the Fourth Circuit held "[a]n accident is an unintended occurrence.

If such happens during medical treatment, it is still an accident . . . ." <u>Id.</u> at 952.[4]

In that case, benefits were claimed for a death caused by a hospital's use of an

HIV-infected needle.  The Fourth Circuit held that the use of the infected needle

was clearly an accident.  <u>Cf.</u>, <u>Chiera v. John Hancock Mut. Life Ins. Co.</u>, 3 F.

App'x 385 (6th Cir. 2001) (holding that a mishap occurring during surgery was an

accident).

Georgia courts hold that "where an injury is unexpected but arises from a

voluntary action it is an accidental injury . . ." <u>Winters v. Reliance Standard Life</u>

<u>Ins. Corp.</u>, 433 S.E.2d 363, 364 (Ga. Ct. App. 1993).  In other words, Georgia law

defines "accident" for insurance purposes as "the unexpected result of an

unforeseen or unexpected act which was involuntarily and unintentionally done."

<u>Johnson v. Nat'l Life & Accident Ins. Co.</u>, 90 S.E.2d 36, 37 (Ga. Ct. App. 1955).

As the case law shows, the term "accident" can be construed along a range

of similar but materially different definitions.  The dictionary defines "accident" as

"an undesirable or unfortunate happening that occurs unintentionally and usually

---

[4]  The difference in definition of the word "accident" between the Fourth and
Seventh Circuit is further evidence of the term's ambiguity.

resulting in harm, injury, damage, or loss," Webster's Encyclopedic Unabridged Dictionary 12 (1996).[5]

These constructions of the term "accident" neither include nor exclude events that occur during surgery, such as those at issue here. The construction of "accident" adopted by the Seventh Circuit defines as accidents only events that are unintended, unexpected, and unforseen. This construction suggests the pedicle screw misplacement is not an "accident," as pedicle screw misplacement was a foreseen possible complication of the surgery. Even though the screw misplacement was neither expected nor intended and occurred only because of a mistake by Dr. Velazco, the possibility of its occurrence was not completely unanticipated.

Under other reasonable constructions, however, the screw misplacement was an "accident" on which Smith was entitled to assert a claim. The screw

---

[5] Interestingly, the definition of the accident when used "at law" is: "such a happening [that is, an undesirable or unfortunate happening that occurs unintentionally] resulting in injury that is in no way the fault of the injured person for which compensation or indemnity is legally sought." Webster's Encyclopedic Unabridged Dictionary (1996).

misplacement was unexpected,[6] unintended, and no fault of Smith's.  It is

undisputed that Dr. Velazco never meant to place the L5 screw in the position he

did.[7]  Webster's definition requires only that the event be unfortunate and

unintended, which, as noted above, the screw misplacement undisputedly was.

Because the term "accident" is subject to multiple reasonable constructions,

it is ambiguous and must be construed against the drafter.  The Fourth Circuit and

Georgia law essentially construe "accident" to mean an injurious event that may be

foreseeable, but is unintended and not reasonably expected to occur.  In the

---

[6] Although screw misplacement was foreseen as a possible complication, it
was not reasonably expected to occur–that is, it was a complication whose
occurrence was possible, but not likely.

[7] The cases indicate that other policies specifically exclude injuries resulting
from surgery or medical treatment.  See, e.g., Whetsell, 669 F.2d at 956.  The
current Policy does not exclude injuries resulting from surgery or medical
treatment, but only injuries: "caused by or resulting from . . . [s]ickness or disease,
except pyogenic infections which occur through an accidental cut or wound."
      Defendants argue only that the term "accident" itself does not include
surgical complications; they do not argue that Smith's injury falls under this
exclusion.  Even if they did, the argument would likely fail.  Unlike the exclusion
in Whetsell, which expressly excluded injuries caused by disease or its treatment,
directly or indirectly, and thus encompassed intervening superceding causes such
as a mistake by the surgeon, the exclusion clause in this Policy only excludes
injuries resulting from disease itself, and does not expressly include intervening
causes such as treatment.  Defendants cannot now try to reform the terms of the
Policy to insert a new exclusion for injuries caused by medical treatment, rather
than those caused by disease itself.

-22-

absence of a specific definition in the Policy or in Eleventh Circuit law, the Court adopts this construction as the most reasonable plain-meaning definition of the term as it is used in the Policy, consistent with the *contra proferentem* principle. Under this construction, the screw misplacement constitutes an "accident" under the Policy, and Defendants cannot deny coverage simply because the accidental injury occurred during surgery for a preexisting condition which itself may not have been disabling.

B.      Direct and Independent Cause

Defendants also argue that Smith is not entitled to benefits for his disability because the screw misplacement did not cause his disability directly and independently of other causes.  Defendants argue that Smith's alleged disability is caused in part by his preexisting back conditions.  They also argue that the October 1999 surgery was made necessary by those preexisting conditions, and is so related to those preexisting injuries that the surgery cannot be said to be a direct and independent cause of whatever disability Smith now suffers.

In Dixon v. Life Ins. Co. of N. Am., 389 F.3d 1179 (11th Cir. 2004), the Eleventh Circuit addressed an ERISA policy whose provisions were in many respects nearly identical to those at issue here.  The policy in Dixon provided

accidental death benefits for bodily injuries "caused by an accident . . . which, directly and from no other causes, results in a covered loss." Id. at 1180. The policy expressly excluded losses caused by "sickness, disease or bodily infirmity." Id.

Mr. Dixon was involved in a car accident, and was pronounced dead upon arrival at the hospital. The actual cause of death was determined to be "cardiac arrhythmia" due to "atherosclerotic and hypertensive heart disease." Id. at 1181. Forensic scientists from the Georgia Bureau of Investigation who investigated the accident issued a report ruling the death an accident, stating there was no evidence of internal injury from the car wreck, and determining that the Mr. Dixon's death was the result of heart disease aggravated by the stress of the accident.

The insurer denied the claim on the grounds Mr. Dixon died from a heart condition, and that even if the accident contributed to his death, the underlying heart condition was a substantial contributing cause. Id.

The Eleventh Circuit construed the "directly and from no other cause" language as equivalent to the "directly and independently of all other causes" language at issue in the present case. Id. at 1184. The court noted that the question of "whether, and to what extent, language in an ERISA policy may preclude

recovery for accidental injury where some preexisting condition was a contributing factor is one of first impression in this circuit." Id. at 1183.

The court reviewed the positions of the other judicial circuits, and adopted the Fourth Circuit's approach:  "a pre-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability or loss." Id. at 1184 (quoting Adkins v. Reliance Standard Life Ins. Co., 917 F.2d 794 (4th Cir. 1990).[8]  The Dixon court explained that the "substantially contributing" test gave the exclusionary language "reasonable content without unreasonably limiting coverage." Id. at 1184.   The court also noted that its definition advanced ERISA's legislative purpose "to promote the interests of employees and their beneficiaries." Id.

_____

[8] In Quesinberry v. Life Ins. Co. Of N. Am., 987 F.2d 1017 (4th Cir. 1993), quoted approvingly by the Eleventh Circuit in Dixon, the Fourth Circuit noted, "A 'pre-disposition' or 'susceptibility' to injury, whether it results from congenital weakness or from previous illness or injury, does not necessarily amount to a substantial contributing cause. A mere 'relationship' of undetermined degree is not enough." Id. at 1028 (quotation and citation omitted).

The Fourth Circuit also held that the "substantial contribution" test required a two-step determination: "first, whether there is a pre-existing disease, pre-disposition, or susceptibility to injury; and, second, whether this pre-existing condition, pre-disposition, or susceptibility substantially contributed to the disability or loss." Id.  The Eleventh Circuit has adopted this two-step test. See, Dixon, 389 F.3d at 1184.

Considering the available record, the <u>Dixon</u> court concluded that Mr. Dixon's heart problems substantially contributed to his death. "It is thus not disputed, on the record, that Mr. Dixon's pre-existing heart condition 'substantially contributed' to his death, regardless of whether the auto accident was the immediate cause in that it triggered his heart attack." <u>Id.</u> at 1184-85.

<u>Dixon</u> was decided in November of 2004.  At the time that Smith and Defendants were compiling the administrative record on which this case was made, the opinion in <u>Dixon</u> had not yet been issued.  Because <u>Dixon</u> decided the effect of "directly and independently" language for the first time in this circuit, the parties had no guidance as to how to evaluate the relationship between Smith's preexisting conditions and his current claimed disability.

As a result, the record lacks any clear statement on the relationship between Smith's degenerative disc disease, his 1997 injury, and his current disability.  Dr. Empting's several statements establish that the L5 nerve root damage resulting from the screw misplacement are a primary cause of Smith's disability, but the statements are unclear regarding the role of the preexisting conditions and injuries. The Court cannot determine on this record whether or to what degree Smith's preexisting back problems contribute to his current claimed disability.

Defendants, quoting a file notation by Dr. Empting, argue that the record shows a substantial contribution.  Defendants argue that Smith's 2003 surgeries were performed to revise the 1999 surgery and to stabilize Smith's L4-5 level to prevent a "slow worsening over time."  Defendants seek to infer that this latter surgical goal shows that Smith's prior back problems contribute substantially to his disability.

This argument is factually unsupported.  The portions of the record cited by Defendants do not support the inference that the "slow worsening" referred to in Dr. Empting's note establishes any relationship between Smith's underlying back problems and his claimed disability.  In the file notation, Dr. Empting stated that Smith would need revision surgery because of the amount of pain incident to the L5 nerve root damage caused by the misplaced pedicle screw.  Defendants quote a portion of the entry that states, "The [surgically implanted hardware] is not unstable and hence, if one could cover up the pain, one could possibly improve function, but we would expect slow worsening over time, particularly with [implanted material] at S1-S2."

This entry does not, as Defendants suggest, establish a substantial contributing relationship between Smith's preexisting injuries and his disability,

but merely notes that Smith has two sets of medical problems: his underlying back injuries and damage to the L5 nerve root. To the extent that the current record has any evidence of nature of the relationship, it undermines Defendants' argument. A pre-surgical discogram in 1997 showed that Smith had no symptoms associated with his L4-L5 disc. Dr. Glick, a physician employed by Defendants to review Smith's claim, stated that he was unable to determine the relative responsibility of the preexisting back injuries and the misplaced pedicle screw for Smith's claimed disability. Dr. Empting's April 3, 2004 letter suggests that the L5 nerve root damage is overwhelmingly to blame for Smith's disability. The letter does not, however, exclude the possibility that Smith's degenerative disc disease and 1997 injury are substantially contributing factors. Dr. Empting wrote, "Very clearly, [Smith] suffered an <u>additional</u> injury with the pedicle screw placement . . . . [and] has not gotten back to pre-operation baseline" (emphasis added). Dr. Empting also notes, "having not had the nerve root injury, [Smith] would have been far more likely to be able to return to a functional status that would allow him to do sedentary-to-light work."

Even if the Court were to make the factually unsupported inference that "slow worsening" referred to Smith's latent back problems and not the L5 nerve

root injury, the inference does not support Defendants' argument.  The record shows, at most, that Smith's preexisting back problems have an unknown relationship to his claimed disability.

Defendants next argue that Smith's prior back injuries substantially contribute to his disability because the prior injuries caused Smith to undergo the 1999 surgery, which in turn caused the pedicle screw misplacement, which caused his claimed disability.  Defendants present no authority for this extension of the law.

Dixon states that the operative relationship to be examined is between the preexisting injury and the claimed disability.  "[P]re-existing infirmity or disease is not to be considered as a cause unless it substantially contributed to the disability . . . ."  389 F.3d at 1184 (emphasis added).  Defendants attempt to interpose another link in the chain of reasoning by seeking to show that the preexisting condition substantially contributed to the accident, which then caused the disability. Defendants argue that if the preexisting injury substantially contributes to the accident that caused the disability, the accident is not the direct and independent cause of the disability.  This argument is unpersuasive.

-29-

In <u>Dixon</u>, for example, the stress of the auto accident aggravated Mr. Dixon's existing heart condition, causing death.  The Eleventh Circuit held that the heart condition was a substantial contributing cause because, whatever damage the accident itself did, the heart condition played an operative role in Mr. Dixon's death.  Defendants ask the Court to extend this reasoning to the situation where, for example, a person suffers a disabling injury in an auto wreck while they are being rushed to the hospital to be treated for a preexisting medical condition.  Even if it were undisputed that the trauma of the car accident was the direct cause of the injury, Defendants' reasoning would allow the insurer to deny coverage because the accident was casually linked to the insured's preexisting condition.  The preexisting condition required the person to be in the speeding car, which caused the accident, which caused the disability.

This approach undermines the purpose of the "substantial contribution" test, which is to give "exclusionary language reasonable content without unreasonably limiting coverage . . . . [and] advance ERISA's purpose to promote the interests of employees and their beneficiaries."  <u>Dixon</u>, 389 F.3d at 1184.

C.    <u>Contractual Limitations Period</u>

Defendants next argue that Smith's lawsuit is barred contractually by the terms of the Policy.  The Policy provides, "No action can be brought after 3 years . . . from the date written proof is required." (Policy, GP-15.)  Written proof must be given:

> within 90 days after the date of such loss.  If it is not reasonably possible to give the proof within 90 days, the claim is not affected if the proof is given as soon as possible. Unless the Insured Person is legally incapacitated, written proof must be given within 1 year of the time it is otherwise due.

(<u>Id.</u> at GP-14.)

The "loss" claimed in this case is a permanent total disability, which is defined as an injury meeting both of the following requirements:

> A). has for a period of 12 consecutive months, continuously prevented the Insured from engaging in any occupation for which he or she is or becomes qualified by education training or experience; and
> B). is determined be [sic] competent medical authority to be permanent, total and continuous.

(<u>Id.</u> at GP-22.)

Smith was obliged to bring this action within three years of the date written proof of his loss was required.  That written proof was required to be submitted, at the latest, within one year and 90 days of the date of loss.  The loss claimed by Smith is defined as a period of continuous incapacity lasting for at least 12 months

coupled with recognition by a competent medical authority that the disability is permanent, total, and continuous.

"[C]ontractual limitations periods on ERISA actions are enforceable, regardless of state law, provided they are reasonable." Northlake Reg'l Med. Ctr. v. Waffle House Sys. Employee Benefit Plan, 160 F.3d 1301, 1303 (11th Cir. 1998). A three-year contractual statute of limitations is "reasonable and thus enforceable." Hembree v. Provident Life & Accident Ins. Co., 127 F. Supp. 2d 1265, 1269 (N.D. Ga. 2000).

To determine whether Smith's claim is barred, it must determine the date of "loss." Defendants argue that the date of loss is the date of the occurrence of the injury, or, at latest, the last day of the 12-month period during which Smith could not work due to disability. Smith argues that the "loss" did not occur until *both* conditions of his disability were met, that is, until he had failed to work for a year *and* had received Dr. Empting's certification that his disability was likely to be permanent, continuous, and total.

The Court finds neither of these approaches satisfactory. Defendants' approach would unjustly bar from suit insureds who may have in good faith and with the exercise of due diligence not been aware that their disability was

permanent until more than three years from the end of a 12-year layoff from work. The Court can envision a scenario in which an insured might undergo a series of corrective procedures or operations that take longer than three years to implement, believing that these procedures will restore some functionality, only to find after the fact that the disability is permanent. Defendants' construction of the policy would unreasonably exclude such persons from seeking redress in court from disputes arising from this condition.

Smith, on the other hand, asks the Court to construe the Policy to mean that an insured can essentially hold open the ability to file suit indefinitely merely by waiting to have a physician certify the existence of a disability that the insured already knows is permanent. This kind of place-marking defeats the purpose of any limitations provision.

The most reasonable construction of this term for purposes of the limitations period seems to the Court to be that the "loss" occurs when: (1) the insured stops working because of a disability; and (2) the insured reasonably becomes aware that the disability is permanent, total, and continuous.[9] This construction is juxtaposed

---

[9] At least one other court appears to have adopted a similar approach when dealing with a policy containing similar language. See, e.g., Mosior v. Ins. Co. Of N. Am., 473 A.2d 86 (N.J. Super. App. Div. 1984).

against the insured's general duty of good faith under the Policy to exercise reasonable diligence in discovering whether his disability is permanent.[10]  That is, the insured has an obligation to make reasonably diligent efforts to have a medical authority evaluate whether his inability to work is a permanent, total, and continuous disability.[11]  This construction is fair to the insured, because the clock for their limitations period does not begin to run until they are aware that they have a claim.  It is also fair to the insurer, because it prevents insureds from opening or reopening claims after excessive periods of time have passed by the expedient of obtaining a doctor's opinion that a long-existing disability is permanent, continuous, and total.

Smith suggests that he did not know his disability was permanent until April 3, 2004.  Defendants suggest that with reasonable diligence Smith could have know that his disability was permanent much earlier, and that he did not reasonably believe that his disability was not permanent.  The record does not indicate when

---

[10]  Conversely, the insurer cannot assert that the clock starts to run when the insured has a reasonable belief that his disability might not be permanent.

[11]  For example, the insured, knowing himself to suffer a permanent disability, is not permitted to delay accrual of the limitations period through deliberate delay in obtaining a professional medical opinion certifying that his known disability is permanent, total, and continuous.

Smith first was made aware that his disability was likely to be permanent.   There is therefore a genuine issue of material fact on this issue, and the Court cannot grant summary judgment to the Defendants on these grounds.

        D.    <u>Claims Limitation Period</u>

Defendants next argue that their denial of Smith's claims was correct because the Smith did not suffer any disability within 180 days of a covered accident, as required by the Policy.  The Policy provides: "If, because of a covered injury and <u>beginning within</u> 180 days after the date of the accident, the Insured sustains Permanent Total Disability as defined below, We will pay 100% of the Principal Sum." (Policy, GP-22) (emphasis added).

Defendants argue that more than 180 days passed between the date of the 1997 accident and the onset of Smith's disability.  As noted above, the Policy defines a "permanent disability" in part as injury that "for a period of 12 consecutive months, continuously prevented the Insured from engaging in any occupation for which he or she is or becomes qualified by education training or experience."  Thus, the first date of onset of a permanent disability under the policy would be the beginning of a twelve-month period in which the insured was incapable of working.  Defendants argue that because Smith's inability to engage

in any employment for a twelve-month period did not commence within 180 days of the 1997 accident, his loss is not covered by the Policy.

Smith argues that Defendants waived the right to deny his claim on this ground, because they did not raise it in their response to his June 7 claim or the appeal of that claim. Smith further argues that even if the Court were to consider Defendants argument, his "loss" began on his last day of work, October 9, 1999, which is within 180 days of the date of the 1999 surgery.

The regulations governing claims procedure under ERISA dictate that all claim administration procedures must be "reasonable." 29 C.F.R. § 2560.503-1(b). Claim procedures are reasonable only if they meet a number of criteria, including a requirement to:

> provide a claimant with written or electronic notification of a plan's benefit determination on review . . . . In the case of an adverse benefit determination, the notification shall set forth, in a manner calculated to be understood by the claimant--
>
> (1) The specific reason or reasons for the adverse determination . . . .

Id. at 2560.503-1(j).

It is undisputed that Defendants provided Smith with notification including the specific reasons for the adverse determination on his June 7, 2004 claim. It

also is undisputed that Defendants did not dispute the timeliness of the claim in that notification.  Smith argues that this constitutes a waiver of Defendants' right to raise the justification now.

In ERISA cases, "post hoc explanations are without merit."   Marecek v. Bellsouth Telecomms., Inc., 49 F.3d 702, 706 (11th Cir. 1995).  "ERISA and its accompanying regulations essentially call for a meaningful dialogue" between insurers and insured.  Abram v. Cargill, Inc., 395 F.3d 882, 886 (8th Cir. 2005) (citations omitted).  Typically, claims of post-hoc explanation occur in circumstances where the administrator's delay in raising the explanation prejudices or forecloses the insured's ability to present evidence on that issue.  See, e.g. Shannon v. Jack Eckerd Corp., 113 F.3d 208 (11th Cir. 1997); White v. Reliance Ins. Co., Case No. 1:05-cv-2149 (N.D. Ga., January 22, 2006).

In the present case, although Defendants' timeliness argument is post-hoc, it does not prejudice Smith's presentation of evidence.  The parties do not dispute the facts or the timing of any of the events at issue, only whether the Policy operates to bar the claim.  The Court declines to find that Defendants waived their right to present this argument to the Court by failing to raise it during the claim review.

Regardless of the waiver issue, the Court does not agree that Smith's June 7, 2004 claim is untimely.  Unlike the claim limitations clause above, which starts the clock on an undefined date of "loss," the 180-day provision of the Policy expressly provides that the insured must sustain a disability <u>beginning</u> within 180 days.  As a matter of logic, this cannot mean that the insured must meet both the 12-month condition and the medical certification condition within 180 days of the accident.

The phrase "sustain a disability" suggests that the relevant inquiry is when Smith began to suffer the disability that prevented him from working–that is, the beginning of the 12-month disability period required under the policy.  In the present case, that 12-month period began in the same month as the accident, October of 1999.

Defendants have repeatedly insisted that the Court treat Smith's June 7 claim as a claim made for the injuries he suffered in his 1997 accident.  Smith's June 7 claim on its face requests benefits arising from the 1999 surgery.  Although Defendants insist the Court treat the 2004 claim as an "appeal" of Smith's October 2000 claim regarding the 1997 accident, there is no genuine dispute that the June 7 claim on its face alleges the 1999 surgery, not the 1997 accident, as the cause of Smith's disability.  The June 7 claim specifically states that the injury is the

damage to the L5 nerve root, that the symptoms are "low back pain, nerve injury, left foot weakness, numbness, and pain," and that those conditions had never caused Smith previous trouble.

Defendants' argument presumes that the October 1999 surgical screw misplacement was not an "accident" within the terms of the Policy. The Court found that the surgical screw misplacement is an "accident" under the Policy. Smith's loss of disability from work was claimed to begin in October of 1999. This is within 180 days of the beginning of the period in which he was unable to work, and thus his claim is not untimely.

E.      Smith's Disability

Defendants last argue that Smith is not in fact disabled.  Defendants rely on the findings of Dr. Glick, an osteopathic surgeon employed to review the appeal of Smith's June 7, 2004 claim.  Based solely on Smith's file, Dr. Glick concluded that Smith should have been able to return to work six months after the 1999 surgery. It is undisputed that Dr. Glick did not examine Smith, and that Defendants did not give Smith an opportunity to address Dr. Glick's findings.  Smith later underwent a functional capacity evaluation, the results of which he alleges contradict Dr.

Glick's report.  Smith attempted to submit this evaluation to Defendants, but they

refused to consider it.

Smith argues that because he was not permitted to respond to Dr. Glick's

report, which was relied on to deny his claim decision, he was denied a full and fair

review of his claims under ERISA.

An employee benefit plan governed by ERISA must:

> (1) provide adequate notice in writing to any participant
> or beneficiary whose claim for benefits under the plan
> has been denied, setting forth the specific reasons for
> such denial, written in a manner calculated to be
> understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant
> whose claim for benefits has been denied for a full and
> fair review by the appropriate named fiduciary of the
> decision denying the claim.

29 U.S.C. § 1133.  Under Department of Labor regulations, a full and fair review

includes the right to review "all documents, records, and other information relevant

to the claimant's claim for benefits," and the right to an appeal that takes into

account "all comments, documents, records, and other information submitted by

the claimant relating to the claim."  29 C.F.R. § 2560.503-1(h)(2)(iii), (iv).  The

issue, then, is whether it was improper for Defendants to fail to provide Smith with

an opportunity to respond to Dr. Glick's report.

The Eleventh Circuit has not ruled on this issue.  The Eighth Circuit, however, has addressed it and provides a sound analytical approach.  In Abram v. Cargill, Inc., 395 F.3d 882 (8th Cir. 2005), the plaintiff was diagnosed with PPS, a progressive illness commonly causing symptoms of fatigue, weakness, and pain.  Despite job modifications, Abram's symptoms worsened, and she applied for long-term disability benefits under an ERISA plan.  Id. at 883-84.  Abrams' plan administrator denied the claim, concluding that there was insufficient objective medical evidence of permanent and total disability "from a 20 hour workweek, sedentary job."  Id. at 884.  Abram was sent by the plan administrator to examination by Dr. Gedan, for him to evaluate whether Abram was disabled by PPS.  Dr. Gedan concluded that Abram was able to perform sedentary or light duty work.  Dr. Gedan concluded that obesity and depression, and not PPS, caused Abram's symptoms.  Id.  Abram's treating physician disputed Dr. Gedan's conclusion, insisting that Abram was incapable of sedentary work.  Without accepting any further submissions, the plan administrator concluded that Abrams was not disabled because she could perform sedentary work.  Id. at 884-85.

Abram appealed the decision.  She submitted a functional capacity evaluation concluding that she could not consistently work more than twenty hours

a week.  She also submitted a letter from her employer clarifying that her job was a

forty-hour per week position.  The plan appeals committee reviewed this material

and concluded that Abram could not work in a full-time position.  They sent the

new material to Dr. Gedan for review.  Id. at 885.

Dr. Gedan concluded that there was no reasonable medical explanation why

Abram could not work eight hours per day.  On the basis of Dr. Gedan's report, the

plan administrator denied Abram's appeal, providing a copy of Dr. Gedan's report

to Abram with the denial letter.

The Eighth Circuit held that Abram was denied a full and fair review under

ERISA.  It concluded that the plan administrator should have permitted Abram to

respond to Dr. Gedan's second report, and remanded the case for further

consideration by the Plan.  Id. at 886.  The court reasoned that "full and fair

review" requires "knowing what evidence the decision-maker relied upon, having

an opportunity to address the accuracy and reliability of that evidence, and having

the decision-maker consider the evidence presented by both parties prior to

reaching and rendering his decision."  Id. (citations omitted).  Because "ERISA

and its accompanying regulations essentially call for a meaningful dialogue"

between insurers and insureds "[p]lan procedures cannot be 'full and fair' without

providing for this communication." Id. (citing Marolt v. Alliant Techsystems,

Inc., 146 F.3d 617, 620 (8th Cir. 1998). "Without knowing what inconsistencies

the plan was attempting to resolve or having access to the report the Plan relied on,

Abram could not meaningfully participate in the appeals process." Id.

Sending an insured a medical report containing new reasons for claim denial

and simultaneously declaring an end to the administrative process before those

reasons can be tested is the sort of "gamesmanship [that] is inconsistent with full

and fair review." Id. (quotations and citations omitted). "There can hardly be a

meaningful dialogue between the claimant and the Plan administrators if evidence

is revealed only after a final decision. A claimant is caught off guard when new

information used by the appeals committee emerges only with the final denial." Id.

This Court, like others in this district, agrees with and adopts the Eighth

Circuit's reasoning in Abram.[12]  In the present case, Defendants' initial notification

denying Smith's claim did not challenge Smith's disability.  Smith appealed the

decision, attaching new information from his physician.  Defendants denied the

_____

[12] See, e.g., Harris v. Aetna Life Ins. Co., 379 F. Supp. 2d 1366, 1374 (N.D. Ga. 2005) (Martin, J.) ("Plaintiff should be provided an opportunity to file any additional evidence that responds to or rebuts the contents of the examiners' reports before Defendant's further consideration of Plaintiff's claim for long-term disability benefits.").

appeal based on Dr. Glick's report, which concluded for the first time that Smith was not disabled.  Defendants submitted Dr. Glick's report to Smith for the first time with the notification of denial.  That letter also stated that Smith should consider his administrative appeals exhausted.  Smith attempted to submit a report of a recent functional capacity evaluation he underwent to prove his disability, but Defendants refused to consider it.

Defendants' failure to provide Smith an opportunity to respond to Dr. Glick's report, and particularly his claim–made without the benefit of examining or even meeting Smith in person–that Smith is not disabled, is inconsistent with the goal of "meaningful dialogue" between the parties and hampered the exchange of information required for a full and fair review.

Smith urges the Court not to remand this matter for further determination, but rather to declare him disabled as a matter of law.  Remand is generally appropriate when the plan administrator has not considered all appropriate evidence that the insured wishes to present on an issue.  See, Shannon, 113 F.3d at 210.  "[S]hould [the beneficiary] wish to present additional information that might affect the determination of eligibility for benefits, the proper course would be to remand [to the plan administrator] for a new determination."  Jett v. Blue Cross &

Blue Shield of Ala., Inc., 890 F.2d 1137, 1140 (11th Cir. 1989).  The Court views the remand decision in light of ERISA's policy of promoting "a meaningful dialogue between the claimant and the Plan administrators . . . ."  Abram, 395 F.3d at 886.

Remand is not appropriate where the wrongful decision to deny benefits was made on a complete administrative record, and the Court can find on the record before it that the claimant is disabled. See, Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1327-28 (11th Cir. 2001).  Remand is also inappropriate where the plan administrator's course of conduct contains such serious procedural irregularities that the insured is "forced to argue a case to a Board that lacked the requisite objectivity . . . ."  Bard v. Boston Shipping Ass'n., 471 F.3d 244, 244-45 (1st Cir. 2006).

Although Smith asks the Court to decide the issue of his disability without remand, he possesses information, particularly the functional capacity evaluation, that he believes would affect Defendants' determination if considered.  Because neither Defendants nor Dr. Glick considered this evaluation, their determination was not made on a full record.  Defendants' determined that Smith failed to proffer due proof of disability without considering all of his proof.

The record does not support the conclusion that Defendants' further review of Smith's claims is likely to lack objectivity.  Defendants reviewed Smith's claims from the 1999 surgery twice, following an proper claim and appeal procedure.  Although Defendants were wrong to conclude that Smith's claims were barred based on the type of injury he suffered and improperly failed to give him a chance to address Dr. Glick's report, there is no evidence of "serious procedural irregularities" sufficient to cast doubt upon their objectivity.

The Court finds that ERISA's goals are best served by remanding for further review that portion of Defendants' determination that concluded Smith was not disabled.  After Smith is permitted to address Dr. Glick's report, Defendants should review whether he has provided "due proof" that he meets the Policy's requirements for permanent disability.

## III.  CONCLUSION

Accordingly,

Plaintiff's Motion for Summary Judgment [21] is **GRANTED-IN-PART** consistent with the terms of this Order.

**IT IS FURTHER ORDERED** that this case is **REMANDED** to Defendant for the limited purposes of:

(1) considering whether Smith's preexisting back problems "substantially contributed" to his current claimed disability.  Defendants will permit Smith to respond to their findings, and will consider any evidence and arguments he raises in response before reaching a final conclusion on this issue; and

(2) allowing Smith to respond to Dr. Glick's report concerning whether he is disabled.  Defendants will consider any evidence and argument Smith raises before reaching a final conclusion on this issue.

Defendant's Motion for Summary Judgment [22] is **DENIED**.

**SO ORDERED** this 16th day of July, 2007.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE